1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10   DAVID MCGUIRE,                    1:11-CV-00330 GSA HC

11                   Petitioner,      ORDER DENYING PETITION FOR WRIT OF
                                      HABEAS CORPUS
12        v.
                                      ORDER DIRECTING CLERK OF COURT TO
13                                    ENTER JUDGMENT AND TERMINATE
     M. MARTEL,                       CASE
14
                    Respondent.       ORDER DECLINING ISSUANCE OF
15   _____/    CERTIFICATE OF APPEALABILITY

16
             Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
17
     pursuant to 28 U.S.C. § 2254.  The parties have consented to the jurisdiction of the magistrate
18
     judge pursuant to 28 U.S.C. § 636(c).
19
                                      **BACKGROUND**
20
             Petitioner is currently in the custody of the California Department of Corrections pursuant
21
     to a judgment of the Superior Court of California, County of Kern, following his conviction by
22
     jury trial on September 20, 2006, of assault with a semi-automatic firearm and possession of a
23
     firearm by a felon.  (CT[1] 549-555, 655.)  In addition, the jury found true the allegations that
24
     Petitioner personally used a weapon and inflicted great bodily injury on the victim.  (CT 549-555,
25
     655.)  In a bifurcated court trial on September 21, 2006, the court found Petitioner guilty of
26
     carrying a loaded firearm in public while an active gang member, found true a gang enhancement
27

28
     _____
          [1]"CT" refers to the Clerk's Transcript on Appeal.

                                            1

1   relating to the court of being a felon in possession of a firearm, and found true that Petitioner had

2   previously served several prison terms. (CT 655.) On December 7, 2006, Petitioner was

3   sentenced to a total determinate prison term of twenty-seven years and eight months. (CT 655.)

4        Petitioner filed a timely notice of appeal.  On May 20, 2008, the California Court of

5   Appeal, Fifth Appellate District ("Fifth DCA"), reversed the criminal street gang enhancement

6   on count 3 but affirmed Petitioner's judgment in all other respects. (See Answer, Ex. A.)  The

7   case was remanded to the superior court for resentencing. (See Answer, Ex. A.)  Petitioner filed

8   a petition for review in the California Supreme Court. (See Lodged Doc. No. 9.)  On August 20,

9   2008, the petition was summarily denied. (See Lodged Doc. No. 10.)

10       On remand, the superior court resentenced Petitioner to a total prison term of 26 years.

11  (See Answer, Ex. C.)  Petitioner appealed to the Fifth DCA from the sentence imposed at

12  resentencing.  On October 28, 2009, the Fifth DCA affirmed the judgment. (See Answer, Ex. C.)

13  Petitioner filed a petition for review in the California Supreme Court, but on January 13, 2010,

14  review was summarily denied. (See Lodged Docs. Nos. 17, 18.)

15       Petitioner also sought collateral relief in the state courts.  On August 17, 2009, he filed a

16  petition for writ of habeas corpus in the Kern County Superior Court. (See Lodged Doc. No. 19.)

17  On October 5, 2009, the petition was denied in a reasoned decision. (See Answer, Ex. B.)  On

18  November 13, 2009, he filed a petition for writ of habeas corpus in the Fifth DCA. (See Lodged

19  Doc. No. 21.)  On April 28, 2010, the petition was summarily denied. (See Lodged Doc. No. 22.)

20  Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court on

21  May 12, 2010. (See Lodged Doc. No. 23.)  The petition was denied without comment on

22  January 12, 2011. (See Lodged Doc. No. 25.)

23       On February 14, 2011, Petitioner filed the instant federal habeas petition.  He filed a First

24  Amended Petition on March 4, 2011.  Following a preliminary review of the petition, on

25  March 14, 2011, the Court dismissed the First Amended Petition with leave to file a Second

26  Amended Petition.  Petitioner filed his Second Amended Petition on March 14, 2011, presenting

27  fourteen grounds for relief.  On June 2, 2011, Respondent filed an answer to the petition.  On

28  September 7, 2011, Petitioner filed a traverse.

1

## STATEMENT OF FACTS[2]

2        On July 30, 2005, many people were at Jefferson Park in Bakersfield. Amanda
Lopez was at the park with Miguel Rosales and their son. Victor Payan was hosting a
3  birthday party at the park for his daughter. Guests at the party included Gilbert Holguin,
Richard Martinez, Iris Hernandez, and six-year-old Liliana R. In addition, another group
4  was having a barbeque.

5        Lopez noticed two men at the barbeque arguing about who brought what to the
barbeque. The man in the striped shirt shoved the other man. The other man returned a
6  blow to the man in the striped shirt. The man in the striped shirt took out a gun. The other
man ran. The man in the striped shirt followed the other man and shot at him several
7  times. After the striped-shirted man stopped shooting, he put the gun in his pants and
walked off. He got into a gray sport utility vehicle (SUV).

8

9        Lopez identified defendant in court as the shooter. She also identified defendant
as the shooter at an in-field show-up shortly after the crime. In addition, she identified an
SUV as the car she saw defendant enter, and identified a shirt as the shirt worn by
10  defendant.

11        Rosales likewise testified that two males were arguing over who brought what to
the barbeque. One was wearing a white button-up shirt and the other was wearing a
12  burgundy jersey. A third man, wearing a light blue striped shirt, tried to calm down the
two men. The man in the burgundy jersey walked away and the man in the white shirt
13  pulled out a gun and shot at the man in the burgundy shirt several times.

14        Rosales could not identify the shooter in court. He did recognize a blue and white
striped shirt (defendant's exhibit A) as the shirt worn by one of the men at the park, not
15  the shooter. He testified he was unable to identify the shooter at an in-field show-up after
the crime. He said the police officers were not pleased that he could not identify the
16  shooter at the show-up. He testified that he and the police do not really get along.

17        Rosales's trial testimony was different from what he told police the day of the
shooting. Shortly after the shooting, Rosales was interviewed by Bakersfield police
18  officer Uriel Pachecho. Pachecho testified that Rosales identified the shooter as wearing a
light blue striped shirt. Pachecho took Rosales to the in-field show-up of defendant and as
19  they approached the location Rosales said, "That's him, that's him."

20        Holquin was about 100 to 150 feet away from the barbeque attended mostly by
males in football jerseys. Some people in the group were arguing. One individual stood
21  out from the other males because he was wearing a striped dress shirt. The man in the
striped shirt started shooting at another person and followed him toward the water park.
22  After the shooting, two others grabbed the man in the striped shirt and got him to leave.
Holquin thought the gun being used was a semiautomatic weapon.

23

24        Holquin identified the striped shirt as the shirt worn by the shooter. He identified
defendant at an in-field show-up as the shooter and identified defendant in court.

25        Martinez testified there was at the park a group of several individuals wearing
football jerseys. One individual in the group had a button-up shirt. Martinez heard the

26

27        [2]The Fifth DCA's summary of the facts in its May 20, 2008, opinion is presumed correct. 28 U.S.C.
§§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
28  adopts the factual recitations set forth by the Fifth DCA.

1  conversations coming from the group getting louder, then he heard gunshots. The
   individual with the button-up shirt was shooting at another. The shooter stopped firing
2  and another individual came and got him. They casually walked away.

3        Martinez was not able to identify defendant in court. He did identify defendant at
   the in-field show-up. In addition, he identified the shirt worn by defendant at the time of
4  his arrest as the shirt that was worn by the shooter.

5        Payan saw a group of males wearing football jerseys at the park. Payan heard
   gunshots and ran to where the children were playing. He saw the shooter with his hand
6  out. The shooter was wearing a striped button-up shirt. People grabbed the shooter and
   took him toward a car.
7
8        Payan identified defendant in court as the shooter. In addition, Payan identified
   defendant at the in-field show-up as soon as he saw him, identified the striped shirt as the
9  shirt worn by the shooter, and said the SUV in the picture looked similar to the vehicle
   the shooter left the area in.

10       Hernandez and her husband were at the park with their daughter, Liliana.
   Hernandez heard loud noises and Liliana's father ran to Liliana. He picked up Liliana and
11 ran to the car. Liliana was bleeding, crying, scared, and hysterical. Liliana had been shot
   in the foot. At the time of trial Liliana had severe scarring to the foot and walked with a
12 limp.

13       Evidence presented at the bifurcated court trial by a gang expert to prove the gang
   enhancement and the separate conviction of being an active gang member in possession
14 of a loaded firearm will be summarized later in the discussion pertinent to those facts.

15 (See Answer, Ex. A.)

16                              **DISCUSSION**

17 I.   Jurisdiction

18       Relief by way of a petition for writ of habeas corpus extends to a person in custody

19 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

20 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

21 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

22 guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County

23 Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a);

24 2241(d).

25       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

26 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

27 enactment. Lockyer v. Andrade, 538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117

28 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,*

                                      4

1   522 U.S. 1008 (1997), *quoting* <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

2   *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320

3   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

4   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

5   II.    <u>Standard of Review</u>

6          Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

7   barred unless a petitioner can show that the state court's adjudication of his claim:

8         (1) resulted in a decision that was contrary to, or involved an unreasonable
          application of, clearly established Federal law, as determined by the Supreme
9         Court of the United States; or

10        (2) resulted in a decision that was based on an unreasonable determination of the
          facts in light of the evidence presented in the State court proceeding.
11

12  28 U.S.C. § 2254(d); <u>Harrington v. Richter</u>, ___ U.S. ___, ___, 131 S.Ct 770, 784, 178 L.Ed.2d 624

13  (2011); <u>Lockyer</u>, 538 U.S. at 70-71; <u>Williams</u>, 529 U.S. at 413.

14         As a threshold matter, this Court must "first decide what constitutes 'clearly established

15  Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71,

16  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

17  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

18  of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words,

19  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

20  set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.  In addition,

21  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

22  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

23  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

24  review under AEDPA. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir.2009), *quoting* <u>Wright v. Van</u>

25  <u>Patten</u>, 552 U.S. 120, 125 (2008); <u>see</u> <u>Panetti v. Quarterman</u>, 551 U.S. 930 (2007); <u>Carey v.</u>

26  <u>Musladin</u>, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

27  end and the Court must defer to the state court's decision. <u>Carey</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S.

    at 126; <u>Moses</u>, 555 F.3d at 760.
28

1    If the Court determines there is governing clearly established Federal law, the Court must

2    then consider whether the state court's decision was "contrary to, or involved an unreasonable

3    application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

4    U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

5    the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6    question of law or if the state court decides a case differently than [the] Court has on a set of

7    materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

8    72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

9    character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

10   New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

11   [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

12   governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

13   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

14   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

15   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

16   the state court identifies the correct governing legal principle from [the] Court's decisions but

17   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

18   "[A] federal court may not issue the writ simply because the court concludes in its independent

19   judgment that the relevant state court decision applied clearly established federal law erroneously

20   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

21   538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

22   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

23   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

24   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

25   the Court determines that the state court decision is objectively unreasonable, and the error is not

26   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

27   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

28   Petitioner has the burden of establishing that the decision of the state court is contrary to

6

or involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. <u>See</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 (9th Cir.2000); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." <u>Cullen v. Pinholster</u>, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. <u>Townsend v. Sain</u>, 372 U.S. 293, 319 (1963), *overruled by,* <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).

III.    <u>Review of Claims</u>

A.   <u>Res Judicata/Collateral Estoppel</u>

On December 19, 2005, the trial court heard Petitioner's motion brought pursuant to Cal. Penal Code § 995 to dismiss the gang enhancements alleged as to Counts One and Two.  Judge James Stuart granted the motion finding that the evidence was insufficient to charge those enhancements.  Nevertheless, Judge Stuart stated that Petitioner "wisely did not direct this particular motion towards Count 3 and 4 because clearly there's enough [evidence] in connection with that." (Rep.'s Tr. at 2:26-28.)

On September 14, 2006, the trial court heard motions in limine.  Of particular note, Judge Michael Bush considered Petitioner's motion to sever Counts One and Two from Counts Three and Four, and for gang evidence to be limited to Counts Three and Four.  (Rep.'s Tr. at 6-8.) Initially, while acknowledging that Judge Stuart had previously dismissed the gang enhancements relating to Counts One and Two, Judge Bush determined that the People could put on evidence of motive with respect to Counts One and Two.  (Rep.'s Tr. at 12-14.)  However,

1  during trial and prior to the admission of any gang evidence, Judge Bush revisited the issue,

2  reversed his earlier ruling, and ruled that the evidence could not come in with regard to Counts

3  One and Two.  (Rep.'s Tr. at 252: 2-4.)

4      Petitioner claims Judge Bush's initial determination that gang evidence could come in as

5  to Counts One and Two to prove motive violated principles of res judicata and collateral estoppel

6  in that Judge Stuart had previously determined the issue.  Petitioner concedes that no gang

7  evidence was admitted relative to Counts One and Two; however, he complains that defense

8  counsel had prepared for the admission of gang evidence and so had referred to potential gang

9  evidence during his opening statement.

10      Petitioner presented this claim on direct appeal to the Fifth DCA.  It was rejected in a

11  reasoned decision on May 20, 2008.  (See Answer, Ex. A at *14.)  Petitioner then presented the

12  claim to the California Supreme Court in a petition for review.  The petition was denied without

13  comment on August 20, 2008.  (See Lodged Doc. No. 10.)  When the California Supreme

14  Court's opinion is summary in nature, the Court must "look through" that decision to a court

15  below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3

16  (1991).  The Fifth DCA analyzed the claim as follows:

17          As previously set forth, the gang enhancements for counts 1 and 2 were dismissed
            prior to trial. Also the gang enhancement for count 3 and the gang crime in count 4 were
18          bifurcated from the other charges. The trial court initially ruled that the People could
            present gang evidence during the initial jury trial on the question of motive. It later
19          reversed itself during trial after the People had presented most of its evidence. Although
            no gang evidence was admitted during the first phase of the trial, defense counsel said
20          during his opening statement that an officer thought that defendant was a gang banger.
            Defense counsel also said that there were individuals at the party associated with street
21          gangs. In addition, the potential jurors were asked questions during voir dire regarding
            gangs.

22          Defendant claims that although gang evidence was not admitted during the first
23          phase of his trial, he was prejudiced because there was a strong implication that defendant
            was a gang member. He contends that, given the prejudicial and inflammatory nature of
24          the implications of gang membership, the trial court's failure to exclude the evidence from
            the beginning deprived him of his rights to due process and to a fair trial.
25
            We disagree. As stated by the trial court at the motion for new trial, based on the
26          same argument presented here on appeal, the prospective jurors had to be asked questions
            regarding their attitudes toward gangs because this was a bifurcated proceeding and the
27          second stage involving the gang allegations was going to be heard by the very jurors
            being voir dired. (At that time defendant had not waived his right to a jury trial as to the
28          gang allegations.)

1
2
3

> There was absolutely no evidence linking defendant to a gang that was presented to the jury. The jury was instructed that statements of counsel are not evidence. In addition, the evidence against defendant was strong, including that defendant was positively identified by four witnesses. Defendant was not prejudiced by the trial court's rulings allowing and then disallowing gang evidence.

4   (See Answer, Ex. A at *14.)

5       It is clear there is no merit to this claim.  First, as noted by the superior court in its denial

6   of Petitioner's habeas petition regarding his allegation that counsel rendered ineffective

7   assistance, collateral estoppel and res judicata are not applicable in preliminary hearings to bar

8   litigation at trial. (See Answer, Ex. B at 3.)  Moreover, Petitioner was not prejudiced in any way.

9   As he concedes, no gang evidence was admitted at trial relative to Counts One and Two.

10  Further, the jury was instructed that statements by counsel are not evidence.  Finally, the

11  questioning regarding gangs during voir dire was necessary because the second phase of the trial

12  involved gang allegations.  The claim must be denied.

13      B.   Prosecutorial Misconduct

14      Petitioner next alleges the prosecutor engaged in misconduct by using deceptive tactics in

15  an attempt to introduce gang evidence.  Specifically, he claims he was prejudiced by the

16  prosecutor's questioning of prospective jurors regarding gangs.

17      This claim was presented by habeas petition to the superior court on August 17, 2009. It

18  was rejected in a reasoned decision on October 5, 2009.  (See Answer, Ex. B at 2-3.)  The

19  superior court's decision was the last reasoned decision on the issue.  Therefore, this Court must

20  "look through" to the superior court's decision.  Ylst, 501 U.S. at 804-05 & n. 3.  The superior

21  court rejected the claim as follows:

22
23
24
25
26

> Petitioner cannot prevail in the claim for prosecutorial misconduct because the appellate court found that the prosecution strictly adhered to the rulings made in the motions in limine, and also found that although there was no specific gang allegations as to petitioner presented before the jury, the jurors could be questioned generally on their attitudes about gangs.  The prosecution also was instructed to question gang expert witness Whisenhunt only generally about gangs, and only as evidence of motive of the shooter, whoever he was.  Where the appellate court found no prejudice to petitioner and no prosecutorial misconduct on these grounds, he cannot raise these contentions again in habeas corpus. *In re Waltreus* (1965) 62 Cal.2d 218, 225.

27  (See Answer, Ex. B at 2-3.)

28

1    A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

2  the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

3  DeChristoforo, 416 U.S. 637, 643 (1974).   To constitute a due process violation, the

4  prosecutorial misconduct must be "of sufficient significance to result in the denial of the

5  defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987), *quoting* United

6  States v. Bagley, 473 U.S. 667 (1985).  Any claim of prosecutorial misconduct must be reviewed

7  within the context of the entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275,

8  1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due process analysis

9  in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

10 prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the

11 prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219

12 (1982). "Improper argument does not, per se, violate a defendant's constitutional rights."

13 Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996), *quoting* Jeffries v. Blodgett, 5 F.3d 1180,

14 1191 (9th Cir.1993). If prosecutorial misconduct is established, and it was constitutional error,

15 the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson,

16 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional

17 error would we have to decide whether the constitutional error was harmless.").

18    In this case, it is clear that the state court's determination was not contrary to or an

19 unreasonable application of the above standard.  The prosecutor did not go astray of any rulings

20 made by the trial court.  Moreover, the prosecutor was entitled to question prospective jurors

21 regarding gangs since the second stage of the trial involved gang allegations.  Further, even if the

22 prosecutor's actions could be considered misconduct, the error was completely harmless since no

23 gang evidence was presented to the jury with respect to Counts One and Two.

24    C.  Judicial Misconduct

25    Petitioner next claims the trial court committed reversible error by informing the jury that

26 Petitioner was in custody and not on bail, and by failing to admonish the jury that gang evidence

27 could not be used to establish motive for the crime with respects to Counts One and Two.

28    Neither claim of  error was properly presented to the California Supreme Court.

10

1    Petitioner raised these claims in a motion to amend the petition in the California Supreme Court,

2    (See Lodged Doc. No. 24.), however the California Supreme Court never addressed Petitioner's

3    motion.  This is insufficient to exhaust state remedies.  Castille v. Peoples, 489 U.S. 346, 351

4    (1989) ("where the [federal] claim has been presented for the first and only time in a procedural

5    context in which its merits will not be considered unless there are special and important reasons .

6    . . [r]aising the claim in such a fashion does not . . . constitute fair presentation.")  The claim of

7    error is therefore unexhausted and must be dismissed.  See 28 U.S.C. § 2254(b)(1).

8        Moreover, the claim is completely meritless.  Petitioner provides no authority for the

9    proposition that the trial court's reference to Petitioner being in custody rather than out on bail

10   requires reversal.  It is inconceivable that this statement by the trial judge would so prejudice

11   Petitioner as to require a mistrial.  See United States v. Acosta-Garcia, 448 F.2d 395, 396 (9th

12   Cir.1971).

13       As to Petitioner's claim that the trial court should have admonished the jury regarding

14   gang evidence, there was absolutely no need for such admonishment since the trial court

15   specifically ruled that no gang evidence could come in with respect to Counts One and Two.

16   (Rep.'s Tr. at 252: 2-4.)  The claim must be denied.

17       D.   Denial of New Trial Motion

18       Petitioner alleges that the trial court failed to correct its error in initially ruling that gang

19   evidence could be admitted to prove motive by granting Petitioner's motion for new trial.

20       Like the preceding claim, this claim of error was not properly presented to the California

21   Supreme Court to satisfy exhaustion.  28 U.S.C. § 2254(b)(1).  It must also be dismissed.

22   Moreover, Petitioner fails to state a federal claim.  He does not allege a specific violation of the

23   Constitution or federal law.  His claim is entirely one of state law, and generally, issues of state

24   law are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have

25   stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting

26   Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993)

27   (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

28   constitutional violation, may not be corrected on federal habeas"). The claim must be rejected.

1    E.   Ineffective Assistance of Counsel

2        In his next ground for relief, Petitioner alleges he received ineffective assistance of

3    counsel for the following omissions: 1) Failure to move for a pre-trial lineup; 2) Failure to obtain

4    and admit into evidence a 9-1-1 call to show Petitioner was the driver of the vehicle and not the

5    passenger, who was identified as the shooter; 3) Failure to call as a witness the officer who

6    interviewed the victim's parents; 4) Failure to call specific witnesses on Petitioner's behalf; 5)

7    Failure to have Petitioner's clothing tested for gunshot residue; 6) Failure to obtain the report of a

8    gunshot residue test performed on the vehicle; 7) Failure to argue a theory of collateral estoppel

9    or res judicata; and 8) Failure to object to prosecutorial misconduct.

10       This claim was presented by habeas petition to the superior court on August 17, 2009, and

11   denied in a reasoned decision on October 5, 2009.  (See Answer, Ex. B.)  Since the superior

12   court's decision was the last reasoned decision on the issue, this Court must "look through" to

13   the superior court's decision on federal habeas review.  Ylst, 501 U.S. at 804-05 & n. 3.  The

14   superior court rejected the claim finding counsel's actions did not constitute ineffective

15   assistance, and finding any alleged omissions did not cause any prejudice.  The superior court

16   addressed certain subclaims as follows:

17       *I. Testimony of Witnesses*

18            Courts will leave it to counsel to determine what witnesses to call.  Courts will not
         second-guess tactical choices by counsel unless there are clear demonstrable reasons that
19       prejudice results.  *People v. Eagle* (1972) 6 Cal.3d 441, 458, *People v. Jackson* (1980) 28
         Cal.3d 264, 289.  Petitioner points to two witnesses, Lashawnda O'Brien and Tasha
20       Farve, who could testify that petitioner was trying to stop an argument.  Petitioner also
         admits that one reason his counsel did not call these witnesses was the possibility of
21       impeachment by the prosecution for gang affiliation.  Impeachment would discredit their
         testimony.  Further, there are no declarations by these women about their testimony.
22
             On the other hand, several witnesses testified as to petitioner's role in the crime as
23       evidenced by the field show-up.  It is understandable why counsel wished to minimize as
         much as possible any gang references even in the bifurcated proceedings.  This court
24       finds no ineffectiveness of counsel for failure to call these witnesses.

25       *II. Lineup*

26            Petitioner takes his counsel to task for failing to call a lineup to positively identify
         petitioner as the shooter.  The appellate court found that no line-up was necessary since
27       the field show-up where petitioner was identified by several witnesses as the perpetrator
         at the park was not unduly suggestive.  Where the appellate court ruled against petitioner,
28       he cannot raise this point in a petition for writ of habeas corpus. *In re Waltreus* (1965) 62

Cal.2d 218, 225.  Consequently, he cannot demonstrate ineffectiveness of counsel on this ground. *Strickland v. Washington* (1984) 466 U.S. 668, 694.

. . .

*IV.  Collateral Estoppel*

Petitioner contends that his counsel failed to raise the defenses of collateral estoppel or res judicata at the trial to keep out evidence of participation in a street gang under P.C. Section 186.22.  Judge Stuart dismissed two allegations of gang enhancement at the motion by counsel made pursuant to P.C. Section 995.  Judge Stuart did not dismiss the gang allegations counts three and four.  Furthermore, the purpose of a preliminary hearing is to ascertain whether probable cause exists that a crime was committed, permitting the binding over of the defendant to answer to criminal charges at a subsequent trial.  P.C. Section 872.  Collateral estoppel or res judicata is not applicable in preliminary hearings to bar litigation in the trial. *People v. Ortiviz* (1977) 74 Cal.App.3d 537, 541 (citing) *People v. Uhlemann* (1973) 9 Cal.3d 662, 667-668. An important note is that the appellate court struck down any gang enhancement reducing petitioner's sentence by twenty months.  There was no collateral estoppel as to the remaining counts where petitioner's conviction was affirmed on appeal. *In re Waltreus* (1965) 62 Cal.2d 218, 265.

(See Answer, Ex. B.)

In this case, Petitioner fails to demonstrate that he was deprived of the effective assistance of counsel.  Counsel did not request a pretrial lineup, but none was warranted.  Under California law, a pretrial lineup is meant to be a remedy when a prior identification procedure was reasonably likely to be defective.  See Evans v. Superior Court, 11 Cal.3d 617, 625 (1974) ("[D]ue process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve.").  The previous identifications were not defective in any manner.

Petitioner's claims regarding the 9-1-1 tape and the gunshot residue tests are speculative and did not prejudice him.  Petitioner alleges there was a discrepancy in the evidence in that there were conflicting accounts of who sat where in the vehicle when it drove away.  Petitioner does not submit a transcript of the 9-1-1 call, but it is of no consequence.  This minor conflict in the evidence, if proffered, could do nothing to overcome the overwhelming evidence against Petitioner.  As discussed by the appellate court, Petitioner was positively identified as the shooter immediately after the incident and in court by five eyewitnesses.  The same rationale applies to

1   the gunshot residue tests.  First, as Petitioner concedes, even if a gunshot residue test of his

2   clothes revealed no residue, there was evidence that Petitioner had possibly changed his clothes.

3   As to the failure to test the vehicle, Petitioner does not state what the result was.  Assuming the

4   test was negative for residue, Petitioner shot at the victim while he was in the park, not from the

5   vehicle.  The test would not have aided Petitioner, and as noted, the evidence of Petitioner's guilt

6   was overwhelming.

7          Petitioner also complains counsel failed to call the officer who interviewed the victim's

8   mother because she failed to identify the shooter even though she "looked directly at the

9   shooter."  (See Petition at 24.)  However, the record does not reflect that the mother looked

10  directly at the shooter.  Rather, the record shows that as soon as Petitioner began firing his gun,

11  the victim's mother ran after her husband toward her children. (Rep.'s Tr. at 300.)  The mother

12  stated that as she was running behind her husband, she looked up and saw a man with his hand

13  outstretched with a gun. (Rep.'s Tr. at 300.)  Nowhere does the record reflect that she viewed the

14  shooter "directly."  In fact, she stated that she only viewed him for "a split second." (Rep.'s Tr. at

15  307.)  When she was interviewed by officers, she stated she could not identify the shooter other

16  than the fact that he was a black male.  (Rep.'s Tr. at 307.)  Given the circumstances of the

17  witness's opportunity to view the shooter, it is not difficult to understand why she could not

18  identify him.  Counsel's failure to call the interviewing officer cannot be considered ineffective

19  assistance.  Certainly, Petitioner suffered no prejudice.

20         Petitioner argues that counsel also failed to call as witnesses, Lawshawnda O'Brien and

21  Tasha Farve.  However, Petitioner concedes that counsel did not call these witnesses because

22  doing so would open the door to the prosecution's introduction of damaging gang evidence.

23  Indeed, the trial court advised defense counsel of this very fact. (Rep.'s Tr. at 252.)  Again,

24  counsel cannot be faulted for this decision, and it is entirely likely Petitioner would have suffered

25  greater prejudice had defense counsel called these witnesses.

26         As for Petitioner's claim that counsel failed to argue collateral estoppel and res judicata,

27  the Court notes from the record that counsel did make repeated objections and arguments

28  concerning the introduction of gang evidence.  (Rep.'s Tr. at 79-81.)  Thus, counsel did not act

1  unreasonably.  In any case, as previously discussed, Petitioner suffered no prejudice since no

2  gang evidence was admitted.

3        Finally, Petitioner complains that defense counsel failed to object to prosecutorial

4  misconduct.  As noted, defense counsel did raise numerous objections and arguments to the

5  prosecutor's attempts to introduce gang evidence.  Moreover, the trial court stated it did not view

6  the prosecutor's actions as misconduct. (Rep.'s Tr. at 253.)  Therefore, Petitioner fails to show

7  counsel acted unreasonably.  Also, Petitioner suffered no prejudice since the trial court already

8  determined there was no misconduct.  Any further objection would have been futile.  In addition,

9  no gang evidence was admitted.

10       Petitioner fails to show counsel was ineffective, or that the alleged ineffectiveness

11  prejudice him in any way.  In light of the record, Petitioner fails to demonstrate that the state

12  court's rejection of his claim of ineffective assistance of counsel was contrary to or an

13  unreasonable application of the Strickland standard.  The claim must be denied.

14       F.   Ineffective Assistance of Counsel - Appellate Counsel

15       Petitioner next alleges he was denied effective assistance of counsel by his counsel on

16  appeal, because appellate counsel failed to argue the collateral estoppel and res judicata issue.

17       Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the

18  Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective

19  assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  Miller

20  v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th

21  Cir.1986).  However, appellate counsel does not have a constitutional duty to raise every

22  nonfrivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983);

23  Miller, 882 F.2d at 1434 n. 10.  The weeding out of weaker issues is widely recognized as one of

24  the hallmarks of effective appellate advocacy.  Id. at 1434 (footnote and citations omitted).  As a

25  result, appellate counsel will frequently remain above an objective standard of competence and

26  have caused her client no prejudice for the same reason--because she declined to raise a weak

27  issue.  Id.

28       As previously discussed, there is no merit to Petitioner's argument of collateral estoppel

1   and res judicata.  In addition, Petitioner could not have suffered any prejudice because no gang

2   evidence was in fact admitted.  Accordingly, Petitioner's claim of ineffective assistance of

3   appellate counsel fails.

4         G.   Denial of State Habeas Petition

5         Petitioner argues that the superior court abused its discretion in denying his petition for

6   writ of habeas corpus.  This is not a valid separate federal claim.  The Court is already tasked

7   with reviewing the state court decision on federal habeas review. 28 U.S.C. § 2254.

8         H.   Impermissibly Suggestive Pre-Trial Identification Procedure

9         Petitioner next claims the in-person show-up identification procedure that took place

10   immediately after the incident was impermissibly suggestive in violation of his constitutional

11   rights.

12         Petitioner presented this claim on direct appeal to the Fifth DCA where it was rejected in

13   a reasoned decision.  (See Answer, Ex. A.)  Petitioner then presented the claim to the California

14   Supreme Court in a petition for review.  The petition was denied without comment on August 20,

15   2008.  (See Lodged Doc. No. 10.)  Insofar as the California Supreme Court's opinion was

16   summary in nature, the Court must "look through" that decision to the appellate decision on

17   federal habeas review.  Ylst, 501 U.S. at 804-05 & n. 3.  In rejecting the claim, the Fifth DCA

18   stated as follows:

19           Prior to trial, defendant made a motion to exclude the identifications based on the
20   in-field show-ups. At the hearing on the motion, defendant argued the in-field show-ups
    were highly suggestive, particularly after a traumatic shooting. The court found nothing
21   unduly suggestive about the show-ups and denied the motion to exclude the
    identifications.

22           Defendant contends the pretrial identification procedures tainted the witnesses' in-
23   court identification of him and violated his right to due process. While acknowledging
    that California courts have not found individual show-ups inherently unfair, defendant
24   urges this court to join the number of jurisdictions choosing to abolish show-ups in light
    of psychological studies revealing their inherent unreliability. Even if we do not find that
25   show-ups are inherently unfair, defendant argues that the show-ups conducted in his case
    were impermissibly suggestive. Defendant claims the show-ups lacked sufficient indicia
    of reliability.
26

27           Preliminarily, we reject defendant's request to diverge from established California
    law that has held that individual show-ups are not inherently unfair. We are bound by the
    decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court*
28   (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

"Defendant bore the burden of showing an unreliable identification procedure. [Citation.] 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 412, 79 Cal.Rptr.2d 408, 966 P.2d 442.)

Defendant claims the show-ups were unduly suggestive because he was the only Black male present; he was handcuffed and surrounded by uniformed officers and patrol cars; and, according to Rosales's testimony, the officer told Rosales the shooter had been stopped and law enforcement wanted Rosales to identify him. In addition, defendant claims there were no exigent circumstances preventing police from constructing a live line-up.

We begin with the well-established law that "[t]he 'single person showup' is not inherently unfair." (*People v. Floyd* (1970) 1 Cal.3d 694, 714, 83 Cal.Rptr. 608, 464 P.2d 64, overruled on another point by *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36, 148 Cal.Rptr. 890, 583 P.2d 748.) While defendant was the only Black male present at the show-up, that was based on the fortuitous circumstance that none of the police officers were Black. All of the victims described the shooter as Black. Clearly the witnesses knew they were not there to identify a police officer. Thus, the fact that defendant was the only Black person at the show-up not differentiate the show-up from any other single person show-up.

Next, defendant argues that his being handcuffed and surrounded by uniformed officers and patrol cars was unduly suggestive. The witnesses were brought to the location to determine if the individual they were shown was the person who had just fired numerous shots in a park crowded with children and others. They were not brought to the location to view a suspect to see if he had taken a candy bar from the local store. The necessity of handcuffs and patrol cars was inherent in the type of crime that occurred and the possibility that the individual being detained was a suspect. "[T]he mere presence of handcuffs on a detained suspect is not so unduly suggestive as to taint the identification. [Citation.]" (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386, 269 Cal.Rptr. 447.)

Defendant's reliance on the testimony of Rosales to support a finding that the show-up was unduly suggestive is misplaced. Rosales testified that on the way to the show-up the officer told him "they had gotten the person that had done the shooting"; at the show-up, he was not sure if the person he was viewing was the shooter. The officer who took Rosales to the show-up testified that he told Rosales "that officers had come in contact with a subject who may or may not be a party or involved and to keep in mind that just because he was being detained or he was being handcuffed, it didn't necessarily mean that this was the suspect. Also informed him that because of the time lapse, that the subject could have changed clothing and might look different than what he looked like at the park."

The other officers who took witnesses to view the defendant testified that they admonished the witnesses that the person they were about to view may or may not be the suspect. The remaining four witnesses who participated in the show-ups testified

17

consistently with what the officers stated regarding the admonition, and all identified defendant as the shooter. The evidence does not demonstrate that the police strongly suggested that the police suspected defendant was the shooter.

The police were not required to construct a live lineup as opposed to an in-field show-up. The show-up occurred shortly after the shooting. "[S]ingle-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.]" (*In re Carlos M., supra,* 220 Cal.App.3d at p. 387, 269 Cal.Rptr. 447.)

A defendant "must show unfairness as a demonstrable reality, not just speculation." (*In re Carlos M., supra,* 220 Cal.App.3d at p. 386, 269 Cal.Rptr. 447.) Defendant has failed to show that the in-field show-ups here were unduly suggestive and unnecessary. Having failed to meet the first criterion of demonstrating that the show-up was unduly suggestive or unnecessary, we need not discuss the factors utilized in determining whether the identification was nevertheless reliable.

(See Answer, Ex. A at *3-4.)

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 302 (1967), *overruled on other grounds by* Griffith v. Kentucky, 479 U.S. 314, 326 (1987). To determine the admissibility of identification testimony, courts employ a two-step analysis. United States v. Love, 746 F.2d 477, 478 (9th Cir.1984).

The first step focuses on whether the identification procedure was impermissibly suggestive. Id., *citing* Manson v. Brathwaite, 432 U.S. 98, 107 (1977); Neil v. Biggers, 409 U.S. 188, 199-200 (1972). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. Biggers, 409 U.S. at 198. An identification procedure is suggestive where it "[i]n effect ... sa[ys] to the witness, 'This is the man.'" Foster v. California, 394 U.S. 440, 443 (1969). Each case must be considered on its own facts, and whether due process was violated depends on the totality of the circumstances surrounding the confrontation. Simmons v. United States, 390 U.S. 377, 383 (1968); see also Stovall, 388 U.S. at 302. If the court finds that a challenged procedure is not impermissibly suggestive, the due process inquiry ends. United States v. Bagley, 772 F.2d 482, 493 (9th Cir.1985) ("Having concluded that the ... show-up was a legitimate identification procedure, we need not reach the question whether the

1  [witness's] identification was reliable under the test enunciated in Biggers." ), *cert. denied*, 475

2  U.S. 1023 (1986).

3          If the identification procedure was impermissibly suggestive, a reviewing court proceeds

4  to the second step and determines whether, under the totality of the circumstances, an

5  identification that resulted from it was nevertheless reliable.  Biggers, 409 U.S. at 198.  Factors to

6  be considered in evaluating the reliability of an identification after a suggestive procedure

7  include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the

8  witness's degree of attention paid to the criminal; (3) the accuracy of the witness's prior

9  description of the criminal; (4) the level of certainty demonstrated by the witness at the time of

10 the confrontation; and (5) the length of time between the crime and the confrontation. Id. at 199-

11 200.

12         In this case, the state court did not unreasonably determine that the showup comported

13 with due process.  First, the state court noted that under well-established law, a single person

14 show-up is not inherently unfair.  See People v. Floyd, 1 Cal.3d 694, 714 (1970).  In Neil v.

15 Biggers, 409 U.S. 188, 198-199 (1972), the Supreme Court pointed out that admission of a

16 single-person show-up does not, without more, violate due process; it is the use of an

17 "unnecessarily suggestive" show-up that is impermissible.  In United States v. Bagley, the Ninth

18 Circuit found that a single person show-up, where a witness identified the defendant while the

19 defendant was "seated in a police car, handcuffed and surrounded by law enforcement," was "a

20 legitimate identification procedure."  772 F.2d at 492.

21         Second, the state court reasonably determined that the procedure was not impermissibly

22 suggestive or unfair.  Prior to the witnesses viewing Petitioner, police warned the witnesses that

23 the individual they had in custody "may or may not be a party or involved and to keep in mind

24 that just because he was being detained or he was being handcuffed, it didn't necessarily mean

25 that this was the subject." (See Answer, Ex. A.)  As further pointed out by the appellate court, the

26 necessity of handcuffs and patrol cars was inherent in the type of crime that had just occurred.

27 Under the totality of the circumstances, it cannot be said that the identifications were

28 impermissibly suggestive.  The state court rejection of Petitioner's claim was neither contrary to,

nor an unreasonable application of, clearly established law.  Petitioner is not entitled to relief on

this claim.

I.  Improper Gang Evidence

In his next ground for relief, Petitioner alleges the trial court erred in admitting gang

expert testimony in violation of his constitutional rights.  He claims the expert witness was not

qualified; he claims the expert improperly relied on hearsay evidence; he claims the expert's

reliance on jail booking records violated his rights against self-incrimination; and he claims the

evidence was improperly based on profile evidence.

This claim was also presented on direct appeal to the Fifth DCA and rejected in a

reasoned decision.  (See Answer, Ex. A.)  It was then presented to the California Supreme Court

in a petition for review.  The petition was denied without comment on August 20, 2008.  (See

Lodged Doc. No. 10.)  The Fifth DCA rejected the claim as follows:

> Defendant claims the trial court erred in admitting the gang expert's testimony for
> several reasons. First, he argues the expert did not properly qualify as an expert because
> he lacked an adequate factual basis for rendering his opinion and the expert was nothing
> more than a conduit for hearsay. Next, he asserts the expert's testimony was based on
> "testimonial" hearsay and was admitted in violation of *Crawford v. Washington* (2004)
> 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (*Crawford* ). His third contention is that
> the expert's reliance on jail booking records violated defendant's right against self-
> incrimination under *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d
> 694 (*Miranda*). His final argument challenging the gang evidence is that the expert's
> testimony was based on inadmissible profile evidence.

*A. Procedural Background*

> Defendant was charged with assault with a semiautomatic firearm (count 1),
> assault with a firearm (count 2), being a felon in possession of a firearm (count 3), and
> being an active gang member in possession of a loaded handgun in public (count 4). A
> gang enhancement was alleged in counts 1, 2 and 3.

> The trial court granted the motion to strike the gang enhancements on counts 1
> and 2. The court recited the following facts to support its finding that the shooting was
> not gang related: (1) the shooting occurred in neutral territory, (2) the defendant was
> arguing about money, and (3) defendant was struck in the mouth before he retrieved his
> handgun from his waistband.

> Prior to trial defendant made a motion to sever counts 3 and 4 from counts 1 and
> 2. In addition, defendant sought to exclude all references to gang evidence during the trial
> on counts 1 and 2. The trial court bifurcated trial on the gang enhancement in count 3 and
> the gang crime in count 4 from the trial on the remaining charges. The court ruled that
> gang evidence could come in as proof of motive. After hearing most of the evidence, the
> trial court reversed itself and found that gang evidence was not admissible as proof of
> motive, finding that this case was one about eyewitness identification and the prejudice

from the gang evidence would outweigh its probative value.

Defendant was found guilty in count 1 (assault with a semiautomatic rifle) with the additional allegations that he personally used a weapon and inflicted great bodily injury.[FN1] He was also found guilty in count 3 of being a felon in possession of a firearm.

> FN1. Count 2 was an alternate crime to count 1; based on the guilty verdict in count 1, defendant was found not guilty in count 2.

After the above verdicts were returned, defendant waived his right to a jury trial on the gang crime and enhancement and the matter proceeded to trial before the court.

The sole witness during the gang trial was gang expert police officer Jerry B. Whisenhunt. In addition, the court was able to consider all of the evidence from the trial on the previous counts tried before the jury.

*B. Expert's Opinion Based on Hearsay*

Defendant claims that Whisenhunt did not properly qualify as an expert and did not have an adequate factual basis for rendering his opinion. The only information Whisenhunt had was based on hearsay provided by other officers; thus he was merely a conduit for hearsay.

Whisenhunt detailed his qualifications as a gang expert, including his experience on the job, which includes contact with gang members, numerous courses he has taken, numerous contacts with other gang agencies, numerous meetings he has attended, organizations he belongs to, and materials he has read regarding gangs.

"Expert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely upon conversations with gang members, his or her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.] Likewise, an individual's membership in a criminal street gang is a proper subject for expert testimony. [Citations.]"  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1463-1464, 119 Cal.Rptr.2d 272.)

Whisenhunt relied on his conversations with gang members, his personal investigations of gang-related crimes, and information obtained from colleagues in reaching his expert opinion. He was properly qualified to testify as an expert.

*C. Application of Crawford to Expert Testimony*

Defendant contends Whisenhunt's reliance on conversations with gang members and other officers' reports of conversations with gang members was error. He claims this evidence could not be utilized under *Crawford* as proof of the primary activities element, the pattern of criminal gang activity, and his membership in the gang.

In *Crawford,* the United States Supreme Court held that testimonial out-of-court statements are inadmissible unless the declarant is unavailable and the accused has had an opportunity to cross-examine the declarant. (*Crawford, supra,* 541 U.S. at p. 59.)

Defendant acknowledges that his argument has been rejected in *People v. Thomas* (2005) 130 Cal.App.4th 1202, 30 Cal.Rptr.3d 582, but he asks this court to disagree with

*Thomas* as wrongly decided. In *Thomas,* other gang members told the expert that the defendant was a member of a gang. The expert utilized this evidence in reaching his conclusion that the defendant was a gang member. The defendant claimed on appeal that the statements were hearsay and their introduction violated his Sixth Amendment rights as explained in *Crawford.* The Court of Appeal disagreed. "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citations.]" (*Id.* at p. 1210, 30 Cal.Rptr.3d 582.)

Subsequent to the *Thomas* decision, the court in *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 64 Cal.Rptr.3d 96 followed *Thomas* and rejected the defendant's argument that the court "denied him his right to confront witnesses when it allowed hearsay testimony about the facts of the predicate crimes." (*Id.* at p. 1426, 64 Cal.Rptr.3d 96.)

We find the *Thomas* and *Ramirez* cases to be well reasoned and we decline defendant's request to disagree with them.

*D. Application of Miranda to Jail Booking Records*

Whisenhunt testified that he reviewed 15 booking records he found relevant to his determination as to whether defendant was an active gang member. The booking information began in May of 1996 and continued until July 30, 2005. In each of the bookings, defendant stated he was a member of the Crips or the East Side Crips (ESC). He stated he wanted to be kept away from Bloods, West Side Crips or both.

Defendant claims Whisenhunt's reliance on jail booking records to conclude he was an active member of the ESC violated his *Miranda* rights. He argues that questioning during bookings regarding gang membership goes far beyond routine booking questions permitted by the Fifth Amendment. He contends that questions regarding an arrestee's gang affiliation or membership are clearly designed to elicit an incriminating response and are therefore are admissible only if proper *Miranda* warnings have been given.[FN2]

FN2. Defendant also claims that to the extent the jail booking records were filled out by jail personnel based on past records and not based on affirmative statements from defendant at the time of his booking the records are irrelevant and insufficient to establish a basis for the expert's opinion. Defendant makes this assertion without any further discussion or citation to any authority. We need not address issues raised that do not contain an adequate discussion with citations to pertinent legal authorities.

The requirements of *Miranda* are well established. To assure protection of the Fifth Amendment privilege against self-incrimination, a suspect may not be subjected to an interrogation while in custody unless he has previously been advised of and has knowingly and intelligently waived his rights to silence, to the presence of an attorney, and to appointed counsel if he is indigent. Statements made in violation of *Miranda* are inadmissible to establish guilt. (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1480-1481, 22 Cal.Rptr.2d 126.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 a

four-justice plurality recognized "a 'routine booking question' exception which exempts from *Miranda's* coverage questions to secure the "'biographical data necessary to complete booking or pretrial services.'"" (*Id.* at p. 601, plur. opn. of Brennan, J.) The court went on to note that a ""booking exception" to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.'" (*Id.* at p. 602, fn. 14.)

In *People v. Morris* (1987) 192 Cal.App.3d 380, 237 Cal.Rptr. 402 (*Morris* ) the booking officer asked the defendant, "'if we should anticipate any type of problem with his being there in jail.'" The defendant answered negatively and then the officer asked, ""Who are you accused of killing?"" The defendant responded that he had killed his sister-in-law. (*Id.* at 388, 237 Cal.Rptr. 402.) We found the defendant's statements inadmissible because it was obvious that this was the type of question that the police should know was reasonably likely to elicit an incriminating response. (*Id.* at p. 389, 237 Cal.Rptr. 402.)

In *Morris,* we recognized that the incriminating response must relate to the offenses for which the suspect is in custody. "The focus of our analysis is *not* what the police may lawfully ask a criminal suspect to ensure jail security. The police may ask whatever the needs of jail security dictate. However, when the police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible against him in a subsequent criminal proceeding unless the initial inquiry has been preceded by *Miranda* admonishments. A police officer's concerns for jail security, encompassing the safety of the suspect, can be triggered by a variety of factors, some of which would have nothing to do with the offense underlying the suspect's incarceration and, as importantly, could only be explored by inquiring of the defendant himself. Thus a suspect who is booked into jail wearing tattoos or other indicia of gang affiliation might alert the booking officer to the possibility of gang-related violence; the quickest way for the officer to resolve such concern is to ask the suspect whether jail personnel should anticipate any trouble in this regard once the suspect becomes housed in the jail. So long as the offense for which the suspect is in custody is not itself gang-related, there is no reason the officer should foresee the question will elicit an incriminating response. In such a circumstance, an incriminating response is not the product of affirmative police conduct and would be admissible in the absence of *Miranda* warnings." (*Morris, supra,* 192 Cal.App.3d at pp. 389-390, 237 Cal.Rptr. 402.)

In the 20-plus years since the *Morris* decision, gangs have become much more prevalent. Questioning about possible gang affiliations for housing purposes is now a routine question that is asked at booking. "The routine booking interview is an indispensable procedure in the efficient administration of justice." (*People v. Quiroga* (1993) 16 Cal.App.4th 961, 971, 20 Cal.Rptr.2d 446.) Questioning about gang affiliations is a security question that must be asked to facilitate safe housing in the jails. The officer conducting the booking inquiry should not have to think ahead to when a question might, in the future, become a link to a crime a defendant might commit. As a result, the existence or nonexistence of *Miranda* advisements on a date not directly linked to the crime for which defendant has been arrested is immaterial to the current offense.

Disregarding the booking information relied on by Whisenhunt from July 30, 2005, the date of defendant's arrest in the present case, we still have before us a record of defendant's being booked into jail 14 previous times from which defendant's booking statements were available to and reviewed by Whisenhunt. There is nothing in the record, including the probation officer's report, suggesting that these other 14 instances involved

gang behavior or gang crimes. Thus, *Miranda* advisements were not required for the gathering of this routine booking information and Whisenhunt could properly rely on this information, consisting of defendant's own statements of gang membership, in reaching his expert opinion.

*E. Profile Evidence*

Defendant contends that Whisenhunt's conclusions were inadmissible because they depended on improper profile evidence. In particular, defendant argues that Whisenhunt proclaimed there is a profile of a generic gang member, defendant acted in accordance with this profile, and thus he possessed the firearm to further the interests of the gang.

As shall be discussed in the following issue, the gang enhancement was not supported by substantial evidence and the street gang firearm possession conviction does not require the gang connection element. Thus error, if any, in admitting profile evidence was harmless. We do note that it is well established that experts can describe the "culture and habits" of criminal street gangs. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, 59 Cal.Rptr.2d 356, 927 P.2d 713.)

(See Answer, Ex. A.)

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated, or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir.1999) ("Even where it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial."); Spivey v. Rocha, 194 F.3d 971, 977 (9th Cir.1999) ("It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process"); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir.1993) ("Habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process."). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991).

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.1995). "Only if there are no permissible inferences the jury

may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" <u>Jammal</u>, 926 F.2d at 920; <u>see also</u> <u>Estelle</u>, 502 U.S. at 70 (holding admission of evidence "relevant to an issue in the case" does not violate due process).

In this case, the testimony of the gang expert did not render the trial fundamentally unfair. First, the state court reasonably determined that the expert was qualified under state law. Second, the gang expert's reliance on his conversations with gang members and other police officers did not violate Petitioner's due process rights under the confrontation clause since the testimonial statements relied on by the expert were not utilized to establish the truth of the matter asserted. <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. 36, 59 fn. 9 (2004). Third, the expert's reliance on Petitioner's previous jail booking records did not violate his <u>Miranda</u> rights, because such information is routinely acquired for safety concerns of jails and prisons. Petitioner's previous fourteen bookings did not involve gang crimes or gang behavior; therefore, <u>Miranda</u> advisements were not necessary since gang-related questions would not be reasonably likely to elicit an incriminating response. Fourth, as to Petitioner's allegation of use of improper profile evidence, the state court reasonably determined that the expert could generally describe the culture and habits of gangs, and in any case, the alleged error was harmless.

The testimony of the gang expert was not contrary to, or an unreasonable application of, Supreme Court law. Petitioner is not entitled to federal habeas relief on this claim. 28 U.S.C. § 2254(d).

J.   Insufficient Evidence of Gang Membership

Petitioner next alleges the evidence was insufficient to prove he was an active participant in a criminal street gang as to Count Four.

This claim was also presented on direct appeal to the Fifth DCA and rejected in a reasoned decision. (<u>See</u> Answer, Ex. A.)  It was then presented to the California Supreme Court in a petition for review.  The petition was denied without comment on August 20, 2008. (<u>See</u> Lodged Doc. No. 10.)  The Fifth DCA analyzed and denied the claim as follows:

Defendant contends the evidence is insufficient to support a finding that he was an

active gang member or that the offenses were committed for the benefit of, at the direction of, or in association with any criminal street gang or with the specific intent to promote, further, or assist in any criminal conduct by gang members.

In a bifurcated proceeding the trial court found true the gang enhancement (Pen.Code, § 186.22, subd. (b)(1))[FN3] attached to his conviction in count 3 of being a felon in possession of a firearm. In addition, the court found defendant guilty in count 4 of carrying a loaded firearm in public while an active participant in a criminal street gang. (§ 12031, subd. (a)(2)(C).)

FN3. All further code references are to the Penal Code unless otherwise noted.

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2007) 27 Cal.4th 1230, 1249, 120 Cal.Rptr.2d 432, 47 P.3d 225.) "We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. [Citation.] We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support" 'the conviction or the enhancement. [Citation.]" (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508, 64 Cal.Rptr.3d 104.)

....

*B. Evidence of Possession of a Loaded Firearm by an Active Gang Member*

Defendant contends the evidence is insufficient to prove he was an active member of a criminal street gang and is insufficient to show that his possession of a loaded gun in public was for gang purposes. (§ 12031, subd. (a)(2)(C).)

Defendant was found guilty in count 4 of possession of a loaded firearm in public by an active participant in a criminal street gang for purposes of section 12031, subdivision (a)(2)(C). The definition of an active participant in a criminal street gang is that set forth in section 186.22, subdivision (a).

In *People v. Schoppe-Rico* (2006) 140 Cal.App.4th 1370, 44 Cal.Rptr.3d 896 the court found that section 12031, subdivision (a)(2)(C), the street gang firearms statute, does not include a gang connection element. In other words, the firearm possession need not be committed with the specific intent to promote, further, or assist in any criminal conduct by the gang. "[T]he Legislature intended the street gang firearms statutes to make it possible to convict active gang members of a felony whenever they are found in possession of a loaded or concealed firearm, even when the prosecution cannot establish any temporal or causal connection between the firearm possession and gang activity." (*People v. Schoppe-Rico, supra,* at p. 1381, 44 Cal.Rptr.3d 896.)

We agree with the analysis in *Schoppe-Rico* and thus need only determine if substantial evidence supports the finding that defendant is an active participant in a criminal street gang.

"In the context of the California Street Terrorism Enforcement and Prevention (STEP) Act (§ 186.20 et seq.), active participation is 'involvement with a criminal street gang that is more than nominal or passive.' [Citation.] It is not enough that a defendant has actively participated in a criminal street gang at any point in time, however. A defendant's active participation must be shown at or reasonably near the time of the

26

crime. Section 186.22, subdivision (a) uses the present tense-'actively *participates*-as did the Supreme Court in *People v. Castenada [People v. Castenada* (2000) 23 Cal.4th 743, 747, 97 Cal.Rptr.2d 906, 3 P.3d 278.]-'involvement ... that *is* more than nominal or passive.'" (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509, 64 Cal.Rptr.3d 104, italics in original.)

Whisenhunt testified that he was familiar with defendant, having contacted him out in the street and having read reports of incidents he had been involved in. Whisenhunt relied on three field interview cards, all from 2000, when the defendant was in ESC territory and in the company of ESC gang members.

Whisenhunt also relied on 15 booking records, dating from 1996 to the date of the current offense. The final five booking records were dated December of 2000, April of 2001, October of 2002, March of 2003, and the current offense in July of 2005. These booking records indicated that defendant associated with Crips and wanted to be housed separately from Bloods. We note that defendant was committed to prison on May 7, 2001 and paroled on September 5, 2002. His parole was revoked in October of 2002 and he was again paroled in January of 2003. In March of 2003 he was committed to prison and was paroled April 14, 2005.

Whisenhunt relied on several police reports. In a report dated November 18, 2000, defendant was placed under arrest for being drunk in public. He was outside his residence in ESC territory. Earlier that day two rival gang members were struck by bullets from a nine-millimeter weapon in a drive-by shooting. The residence where defendant was arrested was searched, and officers found a nine-millimeter loaded firearm in a couch cushion in the house. The officers also located gang-related items in the house.

The next report relied on by Whisenhunt was dated October 20, 2000. Officers responded to an area known as a hang out for ESC gang members. Upon arrival they found firearms and rock cocaine for sale. Defendant was inside the residence with three documented members of the ESC.

On March 8, 2003, officers responded to a wedding reception. It was reported that defendant was unknown to anyone at the reception and was not invited. He was inside of the house where the reception was held and when asked to leave he brandished a firearm.

Whisenhunt testified that defendant had a street moniker of Super Dave. Whisenhunt had spoken to fewer than 10 ESC gang members who identified defendant by his moniker. In October of 2000, Whisenhunt responded to an area and defendant was there. He was wearing a gold chain with a Superman emblem on a pendant.

Whisenhunt testified that he had seen defendant's tattoos, which stated, "Thug 4 life," "rest in peace" with monikers of other gang members, "livin legend," and "Death before dishonor." Whisenhunt testified these were all gang-related tattoos.

It was Whisenhunt's opinion that defendant was an active gang member on July 30, 2005. The basis for his opinion was "everything I've reviewed, which would include field interview cards, jail bookings, tattoos which are on Mr. McGuire's person, along with past cases I have reviewed, including the most current."

Although there are gaps in the evidence of defendant's gang activities, this can be explained because at those times he was in prison. Based on the above evidence (and excluding the field identification card of July 30, 2005, which we previously found inadmissible), sufficient evidence supported the trial court's finding that defendant was an active gang member.

1 (See Answer, Ex. A.)

2        The law on insufficiency of the evidence claim is clearly established.  The United States

3 Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must

4 determine whether, viewing the evidence and the inferences to be drawn from it in the light most

5 favorable to the prosecution, any rational trier of fact could find the essential elements of the

6 crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency

7 claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas

8 review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen,

9 408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision was

10 an unreasonable application of the Jackson standard.

11        In Count 4, Petitioner was convicted of Cal. Penal Code § 186.22(a) which criminalizes

12 active participation in a criminal street gang.  In this case, there was sufficient evidence from

13 which a rational trier of fact could have found Petitioner guilty of active participation in a

14 criminal street gang.  The jury was presented with not only Detective Whisenhunt's opinion that

15 Petitioner was an active gang member of the ESC gang, but the basis for his opinion which

16 included evidence of Whisenhunt's contacts, several jail booking records, police reports,

17 identification of Petitioner's gang moniker by other gang members, and Petitioner's tattoos.

18        Petitioner fails to demonstrate that the state court unreasonably applied Jackson in

19 denying his claim.  The ground must be rejected. 28 U.S.C. § 2254(d).

20        K.   Initial Ruling to Admit Gang Evidence

21        Petitioner next argues the initial ruling made by the trial court that the gang evidence

22 could be admitted to prove motive was a violation of his due process rights.  This claim is

23 essentially the same as his third claim for relief.  For the same reasons, it must be rejected.

24        L.   Imposition of Upper Term

25        In his three remaining claims, Petitioner contends the imposition of the upper terms for

26 the assault conviction and firearm enhancement violated his due process rights, his right to a jury

27 trial, the Ex Post Facto Clause, and the proscription against dual use of facts.

28        Petitioner presented these claims on direct appeal from his resentencing.  The Fifth DCA

1    affirmed the judgment on October 28, 2009. (See Answer, Ex. C.)  Petitioner filed a petition for

2    review in the California Supreme Court, but review was summarily denied. (See Lodged Docs.

3    Nos. 17, 18.)  The Fifth DCA issued the last reasoned decision, as follows:

4           *a. Recent Changes in the Law for Imposing an Upper Term Sentence*

5                  In *Apprendi v. New Jersey* (2000) 530 U.S. 466 the United States Supreme Court
     held that the right of a criminal defendant to a jury trial is violated when the trial court is
6    allowed to increase a criminal penalty beyond the prescribed statutory maximum based on
     a fact, other than a prior conviction, which was not admitted by the defendant or found
7    true by a jury.

8                  In 2007, the United States Supreme Court in *Cunningham v. California* (2007)
     549 U.S. 270 revisited the issue, considering the constitutionality of California's
9    determinate sentencing law after *Apprendi.* The United States Supreme Court evaluated
     Penal Code former section 1170, subdivision (b), which provided that "the court shall
10   order imposition of the middle term, unless there are circumstances in aggravation or
     mitigation of the crime." The court in *Cunningham* found this section violated the rule set
11   forth in *Apprendi* because it created a presumption that made the middle term the
     statutory maximum, thus impermissibly allowing trial courts to impose an aggravated
12   upper prison term "based on a fact, other than a prior conviction, not found by a jury or
     admitted by the defendant." (*Cunningham v. California, supra,* 549 U.S. at p. 275.)
13
                 The California Legislature responded to *Cunningham* by amending the
14   determinate sentencing law effective March 30, 2007. (Stats.2007, ch. 3, § 2.) The
     amendments eliminated the middle term as the statutory maximum and gave the trial
15   court discretion to select among the lower, middle, and upper terms without stating
     ultimate facts deemed to be aggravating or mitigating and without weighing those
16   circumstances. "[A] trial court is free to base an upper term sentence upon any
     aggravating circumstance that the court deems significant, subject to specific
17   prohibitions." (*People v. Sandoval* (2007) 41 Cal.4th 825, 848.)

18                 In *People v. Sandoval, supra,* 41 Cal.4th at pages 853-857, the court held that
     application of the amended version of the determinate sentencing law to all sentencing
19   proceedings conducted after the effective date of the amendments does not violate the
     prohibition against ex post facto laws, regardless of whether the offense was committed
20   prior to the effective date of the amendments.

21                 Although defendant's crime occurred in 2005, his current sentencing occurred
     post- *Cunningham* and under the new version of Penal Code section 1170, subdivision
22   (b). That section now provides in part: "When a judgment of imprisonment is to be
     imposed and the statute specifies three possible terms, the choice of the appropriate term
23   shall rest within the sound discretion of the court ."

24          *b. Constitutional Claims*

25                 Defendant contends that the retroactive application of the amendment to Penal
     Code section 1170, subdivision (b) to his case is a violation of due process and is a
26   violation of the prohibition of ex post facto laws.

27                 Defendant recognizes that the case of *People v. Sandoval, supra,* 41 Cal.4th 825
     resolves these issues against him, but he raises the issues to preserve them for federal
28   review. We are bound by the decisions of the California Supreme Court and we therefore

reject defendant's argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

*c. Fact of a Prior Conviction*

Although acknowledging that all of the United States Supreme Court decisions culminating in *Cunningham* have stated the right to a jury trial does not apply to "the fact of a prior conviction," defendant argues that "the fact of a prior conviction" should be interpreted narrowly. In particular, defendant contends the trial court's three stated factors in aggravation-the numerous prior convictions, the fact that defendant was on parole when the crime was committed, and that his prior performance on probation and parole was unsatisfactory-do not qualify as a "fact of a prior conviction" under a narrow reading of that term. Thus, defendant argues the trial court erred in utilizing these factors because they were not proven to a jury beyond a reasonable doubt.

One of the three aggravating factors used by the trial court was that defendant was on parole at the time he committed the instant offense. "[T]he federal constitutional right to a jury trial and proof beyond a reasonable doubt on aggravating circumstances does not extend to the circumstance that a defendant was on probation or parole at the time of the offense." (*People v. Towne* (2008) 44 Cal.4th 63, 79.)

The trial court stated as an aggravating factor that defendant's performance on juvenile probation, misdemeanor probation, felony probation and state parole was unsatisfactory because defendant continued to reoffend. When a defendant's unsatisfactory performance on probation and/or parole is based on his record of reoffending while on probation or parole, the right to a jury trial does not apply. (*People v. Towne, supra,* 44 Cal.4th at p. 82.) The right to a jury trial applies when unsatisfactory performance on probation and/or parole is based only on facts other than a defendant's convictions sustained while on probation and/or parole. (*Id.* at pp. 82-83.)

The third factor utilized by the trial court is that defendant's prior convictions as an adult and sustained petitions in juvenile delinquency are numerous. "The determinations whether a defendant has suffered prior convictions, and whether those convictions are 'numerous or of increasing seriousness' [citation], require consideration of only the number, dates, and offenses of the prior convictions alleged. The relative seriousness of these alleged convictions may be determined simply by reference to the range of punishment provided by statute for each offense. This type of determination is 'quite different from the resolution of the issues submitted to a jury, and is one more typically and appropriately undertaken by a court.' [Citation.]" (*People v. Black* (2007) 41 Cal.4th 799, 819-820.)

The three aggravating factors utilized by the trial court here have been approved by the California Supreme Court as appropriate conditions arising from the "fact of a prior conviction" that do not require a finding by the jury beyond a reasonable doubt before they can be utilized in imposing an upper term sentence.

*d. Application of Penal Code Section 1170, Subdivision (b) to Enhancements*

Defendant argues that even if Penal Code section 1170, subdivision (b) is constitutionally valid as to the upper term for his convictions, the amendment does not legitimize imposition of the upper term on the firearm enhancement. Defendant argues that the reformed sentencing scheme described by *Sandoval* only applies to substantive offenses and not to enhancements.

We need not determine this issue because, as we will discuss, the trial court

utilized at least one proper aggravating factor to impose the upper term on the firearm enhancement, and this factor was valid before changes to Penal Code section 1170, subdivision (b), and pre- *Sandoval.* A sentencing choice can be valid even if supported by only a single aggravating factor. (*People v. Hall* (1994) 8 Cal.4th 950, 963-964.)

*e. Judicial Fact Finding*

Defendant argues that Penal Code section 1170, as reformed by the California Supreme Court in *Sandoval,* continues to require judicial fact finding as a predicate to the imposition of an aggravated term and, as such, it violates the constitutional right to a jury trial.

This attack is another assault on *Sandoval.* We are bound to follow *Sandoval.* Also, defendant's attack focuses on factors other than those based on the "fact of a prior conviction." Because the trial court's choices were made using factors drawn from defendant's prior convictions, we need not look to the validity of other factors used by the trial court.

*f. Dual Use of Facts*

Assuming for the sake of argument that the new sentencing scheme is valid, defendant argues the trial court erred in any event because it violated the proscription against dual use of facts.

"[T]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed...." (Pen.Code, § 1170, subd. (b).) "To comply with section 1170(b), a fact charged and found as an enhancement may be used as a reason for imposing the upper term only if the court has discretion to strike the punishment for the enhancement and does so." (Cal. Rules of Court, rule 4.420(c); see *People v. Scott* (1994) 9 Cal.4th 331, 350.)

Defendant contends the trial court's three reasons for imposing the upper term on the assault conviction and for the firearm enhancement were all dependent on the convictions that resulted in his prior prison terms. Because the court imposed a one-year enhancement for each of the four prior prison terms, defendant contends the reasons used by the court were a dual use of facts.

In finding that defendant's prior convictions and prior sustained juvenile petitions were numerous, the trial court expressly stated that its finding was made "without regard to the prison prior cases ." Defendant suffered a combined total of over 25 prior convictions and sustained petitions in juvenile court. Over 20 convictions and sustained petitions remain after the convictions that served as the basis for the prior prison terms are removed.[FN2] While this court has held that it is improper to use the same prior conviction to impose an upper term and as a basis for a prior prison term (*People v. McFearson* (2008) 168 Cal.App.4th 388, 392-393), here numerous prior convictions and sustained juvenile petitions remain to support the trial court's finding of numerous prior convictions absent the convictions that were subject to prior prison term enhancements. The court expressly stated that its finding was based without regard to the prior prison terms that were used as enhancements.

FN2. Some of the prior prison terms involved more than one conviction.

Defendant challenges the trial court's use as an aggravating factor that he was on parole at the time of the offense. Defendant contends that one of the convictions that resulted in his parole was also a conviction that was the basis of his prior prison term

enhancement. This argument was rejected in *People v. Yin* (2007) 152 Cal.App.4th 366. "Parole status and performance on parole are distinct aggravating factors. Each is distinct from the aggravating factors of having numerous prior convictions and having served prior prison terms." (*Id.* at p. 369.)

We need not determine the validity of the third factor-that defendant's performance on probation and parole was unsatisfactory-because there are two valid aggravating factors. (We do note that defendant engaged in a nearly continuous cycle of criminal behavior over the course of almost 20 years and was rarely free of custody, probation and/or parole.) The trial court explicitly stated that any one factor would be sufficient to impose the upper term on the conviction and the upper term on the firearm enhancement.[FN3] "A single aggravating factor may support a sentencing choice." (*People v. Yin, supra,* 152 Cal.App.4th at p. 369.)

> FN3. In *People v. Moberly* (2009) 176 Cal.App.4th 1191, we held that a trial court may use the same aggravating factor to impose both an upper term on a conviction and an upper term for a firearm enhancement.

In conclusion, we are bound by the decisions of the California Supreme Court upholding the validity of the changes to the determinate sentencing law post-*Cunningham* and upholding sentencing factors based on the "fact of a prior conviction." In any event, the changes to Penal Code section 1170, subdivision (b) do not affect the sentence here because the factors used by the trial court were valid factors and would support the sentence even under the sentencing law in effect prior to the changes.

(See Answer, Ex. C.)

Petitioner first complains that the application of the amended statute to him violates the Ex Post Facto Clause because his crime was committed prior to the amendment. As set forth above, the Fifth DCA rejected this argument, relying on the California Supreme Court's decision in People v. Sandoval, 41 Cal.4th 825, 853–857 (2007), which held that the application of the amended version of California's determinate sentencing law to all proceedings committed after its enactment does not violate the Ex Post Facto Clause.

In evaluating an Ex Post Facto claim, the controlling inquiry is whether retroactive application of a change in state law creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." Garner v. Jones, 529 U.S. 244, 259 (2000) (citation omitted). The focus is not on whether a legislative change produces "some ambiguous sort of 'disadvantage,'" but rather "on whether any such change increases the penalty by which a crime is punishable." Garner, 529 U.S. at 255, *quoting* California Dep't of Corrections v. Morales, 514 U.S. 499, 506–507 n. 3 (1997). "A law does not violate the clause if it 'created only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered

1   crimes.'" <u>Brown v. Palmateer</u>, 379 F.3d 1089, 1093 (9th Cir.2004), *quoting* <u>Morales</u>, 514 U.S. at

2   513.

3          In <u>Sandoval</u>, the California Supreme Court held "the removal of the provision calling for

4   imposition of the middle term in the absence of any aggravating or mitigating circumstance is not

5   intended to—and would not be expected to—have the effect of increasing the sentence for any

6   particular crime" [and therefore] "the federal Constitution does not prohibit the application of the

7   revised sentencing process ... to defendants whose crimes were committed prior to the date of

8   [this] decision." <u>Sandoval</u>, 41 Cal.4th at 855, 857.

9          In <u>Chioino v. Kernan</u>, 581 F.3d 1182 (9th Cir.2009), the Ninth Circuit ruled that when

10  faced with a <u>Cunningham</u>[3] error, remanding for re-sentencing under the judicially reformed

11  version of Penal Code section 1170(b) pursuant to <u>Sandoval</u> "raise[d] no ex post facto concerns."

12  <u>Chioino</u>, 581 F.3d at 1185–1186; <u>see also</u> <u>Butler v. Curry</u>, 528 F.3d 624, 652 n. 20 (2008)

13  (stating that the application on re-sentencing of the statute judicially reformed by <u>Sandoval</u>

14  would not violate the Ex Post Facto Clause); <u>United States v. Dupas</u>, 419 F.3d 916, 920–921 (9th

15  Cir.2005) (rejecting an Ex Post Facto challenge to the retroactive application of the remedial

16  holding of <u>United States v. Booker</u>, 543 U.S. 220 (2005)), *cert. denied*, 547 U.S. 1011 (2006). If

17  application of the judicially-created rule of discretionary sentencing endorsed in <u>Sandoval</u> does

18  not violate Ex Post Facto principles, neither does application of the same rule as contained in the

19  amended version of Penal Code section 1170(b). See <u>Juarez v. Allison</u>, 2011 WL 3654449, at *7

20  (C.D.Cal.2011) (rejecting an Ex Post Facto challenge to application of the amended DSL

21  statute); <u>Obligacion v. McDonald</u>, 2010 WL 4936349, at *4 (N.D.Cal.2010) (same).  Therefore,

22  Petitioner's argument must be rejected.

23         He also claims the imposition of the upper term violates the state proscription against

24  dual use of enhancements or elements of the offense as aggravating factors.  The issue is one of

25  application of state law and therefore not cognizable on federal habeas review. <u>Estelle v.</u>

26  <u>McGuire</u>, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief

27

28          [3]<u>Cunningham v. California</u>, 549 U.S. 270 (2007).

1   does not lie for errors of state law.' "), *quoting* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990).

2   Moreover, this Court is bound by the state court ruling on the question of state law. <u>Oxborrow v.</u>

3   <u>Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

4        For the foregoing reasons, the state court rejection of Petitioner's claims was neither

5   contrary to, nor an objectively unreasonable application of, clearly established Federal law.  <u>See</u>

6   28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to relief and the petition must be

7   denied.

8                          **CERTIFICATE OF APPEALABILITY**

9        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

10  district court's denial of his petition, and an appeal is only allowed in certain circumstances.

11  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

12  whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

13       (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
         district judge, the final order shall be subject to review, on appeal, by the court
14       of appeals for the circuit in which the proceeding is held.

15       (b) There shall be no right of appeal from a final order in a proceeding to test the
         validity of a warrant to remove to another district or place for commitment or trial
16       a person charged with a criminal offense against the United States, or to test the
         validity of such person's detention pending removal proceedings.
17
         (a)     (1) Unless a circuit justice or judge issues a certificate of appealability, an
18               appeal may not be taken to the court of appeals from–

19                   (A) the final order in a habeas corpus proceeding in which the
                     detention complained of arises out of process issued by a State
20                   court; or

21                   (B) the final order in a proceeding under section 2255.

22       (2) A certificate of appealability may issue under paragraph (1) only if the
         applicant has made a substantial showing of the denial of a constitutional right.
23
         (3) The certificate of appealability under paragraph (1) shall indicate which
24       specific issue or issues satisfy the showing required by paragraph (2).

25       If a court denies a petitioner's petition, the court may only issue a certificate of

26  appealability "if jurists of reason could disagree with the district court's resolution of his

27  constitutional claims or that jurists could conclude the issues presented are adequate to deserve

28  encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327; <u>Slack v. McDaniel</u>, 529 U.S. 473,

                                        34

1  484 (2000).  While the petitioner is not required to prove the merits of his case, he must

2  demonstrate "something more than the absence of frivolity or the existence of mere good faith on

3  his . . . part." Miller-El, 537 U.S. at 338.

4       In the present case, the Court finds that reasonable jurists would not find the Court's

5  determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

6  deserving of encouragement to proceed further.  Petitioner has not made the required substantial

7  showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to

8  issue a certificate of appealability.

9                                          **ORDER**

10       Accordingly, IT IS HEREBY ORDERED:

11       1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

12       2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the

13  case; and

14       3) The Court DECLINES to issue a certificate of appealability.

15

16       IT IS SO ORDERED.

17  **Dated:    February 28, 2012**              _____ /s/ **Gary S. Austin** _____
                                              UNITED STATES MAGISTRATE JUDGE
18
19
20
21
22
23
24
25
26
27
28